| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF RANDOLPH | 23 CVS 1743 |

PEMMCO MANUFACTURING, INC.,  )
)
  Plaintiff,  )
)
v.  )  COMPLAINT
)
APPALACHIAN CAST PRODUCTS,  )  (COMP)
INC.,  )
)
  Defendant.  )

NOW COMES the Plaintiff, PEMMCO Manufacturing, Inc., complaining of the Defendant, Appalachian Cast Products, Inc., and alleges and says as follows:

### PARTIES

1. Plaintiff, PEMMCO Manufacturing, Inc. (herein "Plaintiff" or "PEMMCO"), is a North Carolina corporation with an office and principal place of business located at 631 Veterans Loop Road, Asheboro, Randolph County, North Carolina.

2. Defendant, Appalachian Cast Products, Inc. (herein "Defendant" or "ACP"), is a foreign corporation organized under the laws of the Commonwealth of Virginia, having its principal office located at 26372 Hillman Highway, Abingdon, Virginia.

### JURISDICTION

3. Subject matter jurisdiction over this cause is conferred upon and vested in this Court under and by virtue of N.C. Gen.

Stat. §§ 7A-240 and 7A-243. Personal jurisdiction over Defendant is conferred upon this Court pursuant to N.C. Gen. Stat. § 1-75.4.

4. At all times relevant hereto, Defendant distributed, supplied, marketed, sold, promoted, advertised, and otherwise delivered products in the State of North Carolina.

5. Defendant manufactures aluminum die cast engine parts, among other things, in its Virginia manufacturing plant. After manufacturing the die cast engine parts, Defendant delivers the parts to Plaintiff in North Carolina, in exchange for payment sent from North Carolina to Defendant.

6. Beginning during the year 2019, Defendant began soliciting business from Plaintiff, in North Carolina, offering to produce and sell various die cast parts to Plaintiff for resale to Plaintiff's Customer. Over a period of years, Defendant sent many solicitations to Plaintiff in North Carolina in the form of quotations and numerous electronic and verbal communications. For example, Defendant offered to produce and sell the following part numbers to the Plaintiff: FM-33528, FM-38257, FM-35935, FM-40527, FM-42094, FM-42095, FM-42168, FM-32290, FM-37132, FM38632, FM-34462, and FM-38152.

7. As a result of Defendant's solicitation of business, the parties entered into numerous contracts made in North Carolina over a period of years for the purchase and sale of numerous

aluminum die cast parts for Plaintiff to use in its machine milling business.

### VENUE

8. Venue for this action is properly laid out in this Court pursuant to N.C. Gen. Stat. §§ 1-79 and 1-82 because Plaintiff maintains its principal place of business in Randolph County, North Carolina.

### STATUTE OF LIMITATIONS, STATUTES OF REPOSE, AND CONDITIONS PRECEDENT

9. This action has been brought within all applicable statutes of limitations and statutes of repose. Plaintiff has performed or there have occurred all conditions precedent to Plaintiff's recovery hereunder.

### CLAIM FOR RELIEF

10. The allegations contained in paragraphs 1 through 9 of the Complaint are re-alleged and incorporated herein by reference as if fully set forth herein.

11. Plaintiff owns and operates a production facility for the finish manufacturing, machine milling, and drilling of metals, including, but not limited to, aluminum die cast engine parts. As a part of its business, once Plaintiff machine mills and finishes a particular part, Plaintiff resells the parts to its customers, often various engine manufacturers, which then assemble the engines using parts supplied by Plaintiff among other part

suppliers. Plaintiff orders products, enters into contracts, and negotiates with suppliers from its offices in Asheboro, North Carolina.

12. Plaintiff does not operate a metal foundry for die casting and, therefore, purchases die cast metal parts from suppliers, such as Defendant. Plaintiff has a large Customer (known to Defendant) that manufactures engine components for use in heavy machinery and equipment such as tractors (herein "Customer").

13. Defendant owns and operates a metal foundry for die casting metal parts. In order to die cast metal parts to supply to Plaintiff, Defendant must first design and manufacture a mold and associated tooling according to the specifications supplied by Plaintiff's Customer, which is the engine manufacturer.

14. Defendant is aware when it undertakes to die cast metal parts for Plaintiff that those parts are destined to be machined by Plaintiff into finished pieces and then resold by Plaintiff to its Customer, which in turn incorporates the parts into a larger machine such as an internal combustion engine.

15. This case arises from Defendant's failure to properly design and manufacture a four (4) cavity mold, associated tooling, and trim die ordered by Plaintiff which was intended to produce aluminum die cast fuel manager headers, also called header filters, having part numbers FM-33528 and FM-35935 (herein "Header Filters") according to the product specifications supplied to

4

Defendant by Plaintiff's Customer (herein "Specifications"). The Customer's part numbers relate to the detailed design and Specifications required for the casting of the Header Filters to be acceptable.

16. Plaintiff has a contract with its Customer for Plaintiff to supply finished aluminum die cast Header Filters to the Customer. Because the Header Filters are involved in the fuel supply of an internal combustion engine, they must be manufactured to very strict standards and specifications including, but not limited to, porosity specification 70406. If porosity is present in a casting it could cause a leak during operation, that could cause a dangerous and potentially catastrophic engine failure in the final product, such as a fire or explosion.

17. In order to fulfill the Header Filters supply contract with its Customer, Plaintiff contracted with Defendant for the supply of Header Filters according to the Customer's strict specifications.

18. Plaintiff and Defendant established a course of dealing for the supply and purchase of the Header Filters. From 2019 through 2022, Defendant submitted quotations to Plaintiff with pricing for the sale of Header Filters to Plaintiff. These quotations were subject to industry standard quarterly adjustments based on the cost of aluminum.

19. In 2019, Plaintiff contracted with Defendant for the design and production of a mold and associated tooling so Defendant could die cast the Header Filters and sell them to Plaintiff at the offered prices. Defendant was aware that the Header Filters would be machine milled and finished into final form and resold to Plaintiff's Customer. The original offer from Defendant was made on June 17, 2019 for the production of the mold and associated tooling (herein the "First Mold"). Plaintiff accepted the offer by issuing a purchase order to Defendant for the First Mold on August 6, 2019. The parties agreed that the First Mold would produce Filter Headers that would comply with all Specifications and requirements of Plaintiff's Customer.

20. This First Mold was supposed to have a useful shot life of 100,000 shots capable of producing 4 castings per shot which would produce 400,000 castings. After 400,000 castings were produced using the First Mold, the parties understood that a new mold would need to be fabricated.

21. Defendant designed and produced the First Mold as agreed. Defendant began to use the First Mold to produce Header Filters and sold over 198,000 of these parts to the Plaintiff.

22. Defendant made the Header Filters for a period of time and delivered them to Plaintiff in North Carolina. Defendant invoiced Plaintiff in North Carolina for the products it shipped to Plaintiff. Plaintiff paid these invoices from its North Carolina

6

bank accounts and Defendant accepted these payments from North Carolina. Plaintiff would purchase the parts that complied with the Customer's Specifications. Thereafter, Plaintiff would machine the Header Filters into final form, resell, and deliver them to its Customer for incorporation into its engines.

23. Production of the Header Filters using the First Mold continued through 2021 when the First Mold began to exhibit signs that it was deteriorating. Around the middle of 2021, the castings produced by Defendant using the First Mold began to degrade. During the year 2021, many of the Header Filter castings resulting from the First Mold failed to comply with the Customer's specifications and had to be returned to Defendant. Many of these castings had to be returned due to excess porosity and/or excess leakage. Defendant acknowledged that the Header Filter castings were defective and accepted their return.

24. Defendant stopped delivering Header Filter castings using the First Mold for certain parts in late 2021 and other parts in early 2022. The degradation of the First Mold occurred earlier than anticipated, since it had only produced a little over 198,000 Header Filters at that point in time. The First Mold began to have problems even before the end of its supposed useful life, as demonstrated by the returned Header Filter castings that Defendant acknowledged were defective.

25. Defendant acknowledged that the First Mold needed to be replaced before the end of its useful life, but Defendant desired to continue to manufacture and sell the Header Filters. Therefore, Defendant solicited Plaintiff in North Carolina for the re-design, fabrication, and the sale of a replacement mold.

26. Starting in April 2021, Defendant began making solicitations to Plaintiff for the purchase and sale of a replacement mold. Defendant made a presentation to Plaintiff, and its Customer, seeking to allow Defendant to modify the design of the First Mold when designing the next mold to replace it. Defendant claimed the changes would result "in fewer seam lines allowing excessive flash and fewer components required for tooling." Defendant stated the changes it proposed to the next mold would improve the efficiency of the die casting process and presumably result in a lower cost to Plaintiff and its Customer, the end user. After Defendant presented its proposed design changes, Plaintiff and its Customer agreed to allow Defendant to re-design the next mold to produce the Header Filers.

27. Defendant continued to solicit business from Plaintiff by submitting a new offer and quotation to Plaintiff on August 24, 2021, for the procurement of a replacement die cast mold using Defendant's new design, which included four (4) cavities resulting in four Header Filters at each casting, plus a Trim Die (herein "Second Mold"). Importantly, the Second Mold was to produce the

8

same Header Filters with the same Specifications as before, but more efficiently. The Customer did not re-design the Header Filter part itself, nor were the Specifications changed. Defendant was completely responsible for properly designing the Second Mold and held itself out has having the expertise to do so.

28. Defendant offered to fabricate the Second Mold for part numbers FM-33528/FM-35935 for the sum of $89,387.20, plus a Trim Die for the sum of $29,700.00, and estimated tariff in the amount of $15,962.00. The offer for fabrication of the Second Mold was contained in Defendant's quotation #04232021PCDB dated August 24, 2021 (herein "August 24, 2021 Quotation"). The total price quoted by Defendant for the Second Mold was $135,049.20.

29. The August 24, 2021 Quotation stated, among other things, that it was an "updated tooling quote using new tooling design" and that it would be a four (4) cavity mold. The August 24, 2021 Quotation stated the Second Mold would be ordered after receipt of a purchase order, first 1/3 of payment, and approved "3d" casting model. The August 24, 2021 Quotation said the Second Mold would be complete in fourteen (14) weeks plus four to six (4-6) weeks of offshore shipment transportation.

30. Plaintiff accepted the offer set forth in the August 24, 2021 Quotation by submitting its Purchase Order #29914 dated September 29, 2021 to Defendant for production of the Second Mold and Trim Die with an estimated total cost of $135,049.20, thereby

forming a contract (herein "Contract"). The resulting Contract was made in North Carolina. According to the Contract, payment was to be in thirds. The payment terms were 1/3 with purchase order, 1/3 on tool/mold completion, and the final 1/3 on sample approval.

31. The description of the Second Mold in the Contract says, "FM-33528/FM-35935 4 Cavity Mold" with a delivery due date of February 16, 2022 for the amount of $89,387.20. The numbers FM-33528/FM-35935 refer to the Customer Part numbers that are to be die cast using the Second Mold. The description also references Defendant's August 24, 2021 Quotation #04232021PCDB and states, "***LEVEL 3 PPAP REQUIRED***". The Contract also provides, among other things: "SELLER SHALL MEET ALL SUPPLIER QUALITY AND REGULATORY REQUIREMENTS APPLICABLE TO PURCHASER AND SHALL COMPLY WITH THE REQUIREMENTS OF ANY ACCREDITED PROFESSIONAL SOCIETY THAT THE SELLER IS REGISTERED WITH SUCH AS AN ACCREDITED ISO 9000 REGISTRAR, ALONG WITH PURCHASER'S REQUIREMENTS." "PEMMCO MFG., EXPECTS 100% ON-TIME DELIVERY REQUIREMENTS AND ANYTHING LESS IS NOT ACCEPTABLE."

32. Defendant agreed to design and fabricate the Second Mold so that it would produce Header Filters in compliance with the product Specifications for the Customer's part numbers FM-33528/FM-35935. The Customer's part numbers relate to the detailed design and Specifications required for the casting of the Header Filters to be acceptable.

10

33. The actual amount of money that Plaintiff paid for the Second Mold, Trim Die, and tariff was $99,994.14. The Contract provides that the final 1/3 of the price is paid "ON SAMPLE APPROVAL." This means that the final payment for the Second Mold is not due until after the Pre-Production Part Approval Process, also known as "PPAP" testing, confirms that the Second Mold is able to produce acceptable Header Filters. PPAP is the industry standard for testing and approving parts prior to mass production. This procedure has specific criteria to prove that the product resulting from the Second Mold is ready for production.

34. Anticipating the delivery and completion of the Second Mold in 2022, Defendant continued to submit to Plaintiff a succession of quarterly "quotation submittal forms," the last of which was dated December 19, 2022 and was to apply to the 1st Quarter of 2023 part orders for the Header Filters and other parts.

35. On its own, Defendant decided to contract with a mold fabricator in China to fabricate the Second Mold. Defendant and/or its sub-suppliers delayed the design and fabrication of the Second Mold, which was supposed to be delivered in February 2022 according to the Contract.

36. Once Defendant received the Second Mold sometime after mid-June 2022, the parties began to collaborate to conduct the required PPAP testing of castings from the Second Mold.

11

37. The first series of test castings from the Second Mold was made in Defendant's facility in Virginia, then the test castings were shipped to Plaintiff in North Carolina in connection with the PPAP testing.

38. From June 2022 through March 2023, Defendant made many attempts to produce viable Header Filters using the Second Mold, but the testing always failed the porosity and leak tests at unacceptable levels. During this time frame, Defendant even delivered the Second Mold to at least two sub-manufacturers to see if they could achieve acceptable results using the Second Mold. Neither of these sub-manufacturers could achieve acceptable results using the Second Mold, either.

39. One of Defendant's sub-manufacturers was RCM Industries a/k/a Aallied, located in Alabama (herein "RCM/Aallied"). During March 2023, RCM/Aallied produced and delivered to Plaintiff in North Carolina five hundred (500) test Header Filters, but this shipment also failed the PPAP porosity and leak testing.

40. RCM/Aallied blamed the production problems on a "poorly designed die" in a March 15, 2023 email sent to Plaintiff from Defendant's broker Mark Schnur. In other words, Defendant's own sub-manufacturer stated that Defendant's design for the Second Mold was defective and was to blame for the Second Mold's inability to produce Header Filters that would comply with the Contract.

41. Defendant informed Plaintiff in the month of March 2023 that Defendant had given up using the Second Mold, did not have the production capacity to produce the Header Filters, and informed Plaintiff it would not be able to produce Header Filters using the Second Mold.

42. Defendant breached the Contract by anticipatory repudiation when it notified Plaintiff that it would not perform under the Contract.

43. Defendant could not deliver sample castings from the Second Mold that complied with the Customer's Specifications as required by the Contract. Defendant breached the Contract by fabricating the Second Mold that was defective and incapable of producing Filter Headers in compliance with the Contract. Therefore, Plaintiff is not required to make the final 1/3 payment.

44. Plaintiff rejected the Second Mold and is entitled to a full refund of the advanced funds for fabrication of the Second Mold in the sum of $99,994.14. Plaintiff demanded a complete refund of the advanced funds, but Defendant failed and refused to refund this money.

45. Plaintiff had to purchase substitute Header Filters from two other die cast suppliers at an increased cost, in order to satisfy the requirements of its contract with its Customer, due to Defendant's breaches of contract.

46. Plaintiff was required to purchase the substitute Header Filters from two other suppliers at a substantial cost increase, as a direct and proximate result of Defendant's failure to produce a working Second Mold. This resulted in substantial damages to the Plaintiff.

47. Plaintiff has suffered substantial damages, including direct, special, consequential, and incidental damages in an amount in excess of $25,000.00, the exact amount of which is undetermined and will be determined at the trial of this matter, as a direct and proximate result of Defendant's breaches of contract.

48. Plaintiff has fully performed its obligations pursuant to the Contract.

49. This action has been brought within all applicable statutes of limitations and/or repose. Plaintiff has performed or there have occurred all conditions precedent to Plaintiff's recovery hereunder.

**SECOND CLAIM FOR RELIEF**
(Breach of Contract)

50. The allegations contained in paragraphs 1 through 49 of the Complaint are re-alleged and incorporated herein by reference as if fully set forth herein.

51. Plaintiff and Defendant entered into a Contract whereby Defendant agreed to fabricate the Second Mold that would produce

14

Header Filter castings that would comply with the Specifications required by the Contract.

52. The Second Mold failed the PPAP process.

53. The Second Mold is defective and fails to comply with the Contract.

54. Plaintiff properly and justifiably rejected the Second Mold and demanded that Defendant refund the money advanced for fabrication of the Second Mold.

55. Defendant breached the Contract by informing Plaintiff that Defendant did not have the production capacity to produce the Header Filters, and informed Plaintiff it would not be able to produce Header Filters using the Second Mold, among other things.

56. Defendant breached the Contract by failing and refusing to pay the refund in the amount of $99,994.14, associated with the defective Second Mold that was rejected by the Plaintiff.

57. In addition to the refund in the amount of $99,994.14, Plaintiff is entitled to recover all special, incidental and consequential damages arising from the breach.

58. Plaintiff's incidental damages resulting from the Defendant's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach, including

but not limited to the expenses Plaintiff incurred during the failed PPAP and/or testing process.

59. Plaintiff's consequential damages resulting from Defendant's breach include the additional costs of purchasing substitute Header Filters from other suppliers during the expected and agreed useful life of the Second Mold.

60. Defendant is aware that the Header Filters that were supposed to be produced by the Second Mold were being purchased by Plaintiff, so that it could then machine them into finished products in order to resell to its Customer. Defendant knew or reasonably could have foreseen that the probable result of a defective Second Mold would be that Plaintiff would be required to purchase Header Filters from other sources at an increased price, thereby causing Plaintiff to lose profits associated with supplying Header Filters to the Customer.

61. Defendant agreed that the Second Mold would have a useful life of 100,000 shots capable of producing 400,000 Header Filters. Defendant knew or should have known that Plaintiff was relying on Defendant to supply the Header Filters at the prices that Defendant quoted to Plaintiff from 2019 through 2022 (subject to industry standard quarterly adjustment based upon then-current American Metal Market fluctuations) for the useful life of the Second Mold.

62. Defendant knew or should have known that, if the Second Mold was delayed or failed to work, Plaintiff would be required to

16

purchase the Header Filters from other sources, at an increased cost to Plaintiff, in order to fulfill its orders from the Customer.

63. Plaintiff was required to purchase the substitute Header Filters from two other suppliers at a substantial cost increase as a direct and proximate result of Defendant's failure to produce a working Second Mold. This caused Plaintiff to lose substantial profits when Plaintiff resold the Header Filters to its Customer.

64. Plaintiff has purchased approximately 342,960 substitute parts costing over one dollar more per part than Defendant's quoted pricing, as of June 5, 2023. Therefore, Plaintiff has suffered additional damages at least in the amount of $443,584.93 as of June 5, 2023.

65. The amount of damages will continue to accrue until Plaintiff has purchased 400,000 substitute Header Filters, which was the expected useful life of Defendant's defective Second Mold. As a direct and proximate result of Defendant's breaches of contract, Plaintiff has suffered, and will continue to suffer, damages for the increased cost of the substitute Header Filters.

66. Plaintiff has made numerous demands for payment from Defendant, but Defendant continues to refuse to pay the amounts that are due and owing to Plaintiff.

67. Plaintiff fully performed its obligations pursuant to the terms of the agreement between the parties.

17

68. There is presently due and owing to Plaintiff by Defendant a sum in an amount exceeding Five Hundred Fifty-Eight Thousand Four Hundred Seventy-One Dollars and Sixty-Five Cents ($558,471.65), plus interest accruing at the legal rate, which is currently eight percent (8%) per annum, on the past-due amount from June 28, 2023 until paid in full, plus all costs of collection as allowed by law, as a direct and proximate result of Defendant's breaches of contract, as of June 28, 2023.

69. Plaintiff has performed or there have occurred all conditions precedent to Plaintiff's recovery under this claim for relief.

70. This claim has been brought by Plaintiff within all applicable statutes of limitations and repose.

WHEREFORE, Plaintiff, PEMMCO Manufacturing, Inc., prays unto the Court as follows:

1. That Plaintiff, PEMMCO Manufacturing, Inc., have and recover of Defendant, Appalachian Cast Products, Inc., a judgment on its Breach of Contract claim in an amount exceeding Five Hundred Fifty-Eight Thousand Four Hundred Seventy-One Dollars and Sixty-Five Cents ($558,471.65), plus interest accruing at the legal rate, which is currently eight percent (8%) per annum, on the past-due amount from June 28, 2023 until paid in full, plus all costs of collection as allowed by law; and

2. That Plaintiff, PEMMCO Manufacturing, Inc., have and

recover of Defendant, Appalachian Cast Products, Inc., its costs in this matter; and

3. That Plaintiff, PEMMCO Manufacturing, Inc., have and recover of Defendant, Appalachian Cast Products, Inc., such other and further relief as this Court deems just and proper; and

4. That Plaintiff, PEMMCO Manufacturing, Inc., have a jury trial on all issues so triable.

This the 24th day of August 2023.

THE LAW OFFICE OF JOHN T. BENJAMIN, JR., P.A.

John T. Benjamin, Jr.
N.C. State Bar No.: 18673
benjamin@lawjtb.com

William E. Hubbard
N.C. State Bar No.: 23605
1115 Hillsborough Street
Raleigh, NC 27603
Telephone: (919) 755-0060
Facsimile: (919) 755-0069
hubbard@lawjtb.com
*Attorneys for Plaintiff,
PEMMCO Manufacturing, Inc.*